This is Gabriel Technologies v. Qualcomm, 2013-12-05 and in both cases we have different counsel arguing. There's no need to move, in fact. Thank you, Your Honor. This is a different name. Mr. Mayer, when you're ready. This is the attorney's briefcase. It is, Your Honor. Yes, Your Honor. Thank you, Your Honor. May it please the Court, my name is Robert Mayer with Chapin Fitzgerald and I also represent appellants in this case. Even if the Court is inclined to affirm the summary judgment rulings below and we agree that it should not, it should nevertheless reverse the District Court's unprecedented attorney fee sanction in this case. There are two reasons for this. First, Gabriel's claims are supported by a substantial body of objective evidence and second, there's a great deal of evidence supporting Gabriel's good faith belief in those claims. Indeed, this is not a case in which the Court needs to grapple with difficult questions of the jurisprudence on attorney fee sanctions. This is not a closed case. Under the uncontroversial and subtle understanding of California's Uniform Trade Secrets Act and under any reasonable interpretation of the Patent Act, the District Court committed reversible error when it ignored key evidence on this question at every turn. Don't we have evidence in the record? One of your people said we have no case, just a lot of talk. Those words do appear in the record, Your Honor. That is an email written by John Hall, a former board member, and the District Court seized on those words to make the wholesale conclusion that Gabriel and nobody at Gabriel believed in their claims and this is a question of subjective bad faith. That email read in whole, however, demonstrates that Mr. Hall and others were concerned and frustrated with prior trial counsel in the case. They originally had their first trial counsel in the case had left and there was quite a bit of frustration about the fact that that counsel had retained essentially the client file and was refusing to turn it over. One of your people said the real value was never there anyway. That's right, and he explained at his, I believe that was Allen Angus, he explained at his deposition, and we provided citations to that deposition testimony in our briefs, that what he meant was, and there's extensive discussion in the email from which that came, if you read the email in total, and I believe that that is at A6003 and forward and A6010 and forward, those are some key email. One writes to another saying it's been three and a half years since you started on this scavenger hunt with no results. And isn't that consistent with the fact that your side was having trouble figuring out who the inventors were for your inventorship claims? I mean, as of 2010, you seem to be having problems identifying who on your team is the exact inventor for a lot of these patents. And then you figured out you hit the wrong target with the first guy and then you had to migrate to a second guy. So, I mean, I don't know what to make of all this. It feels half-baked, doesn't it? Well, to answer your first question, is it consistent with the difficulty in identifying inventors? Yes. Was it difficult to identify inventors? Yes. Why? You had the patents in front of you, right? Yes, Your Honor. So what's the problem? Your team knows what they discovered and invented, and then they decided to file a lawsuit in the fall of 2008, and then yet two years later, by 2010, still couldn't figure out who were the inventors. Part of it is a matter of time frames and simply the difficulty of fact-gathering. We've got a ten-year, a decade time frame. We do have some difficulty in locating people. You had four years to do it, right? Indeed. At least according to one narrative, you were suspicious at least by fall of 2004, if not January of 2003. That's a pretty long time. That's true, and as Mr. Salzman pointed out, many of the people no longer worked for the company, which created some of the difficulty. But the point that I want to make with regard to the fee appeal is that… You eventually landed on Kleist a lot of the times, ultimately, right? That's true, and in fact what it is… And Kleist didn't go to Tahiti and hide for six years, did he? No, Your Honor. Okay. And in fact, Mr. Kleist testified, and that's in the merits reply brief. Some of his testimony is laid out explicitly. He did testify that he did contribute inventions to some aspects of this intellectual property. And this gets me back to the point that really the question here on the fee appeal, though, is not whether we succeeded in identifying inventors, not even whether we succeeded in developing enough evidence to raise a material issue of fact on that question, which was the standard. Rather, the question on fees is whether we had enough evidence to show that our claims were not completely baseless, or under the California Uniform Trade Secrets Act, that there was not a, quote, complete lack of evidence, and that's the FLIR case. That's simply not the case here. There is a tremendous amount of evidence. Whether that evidence proved our case is not the question that needs to be answered with regard to fees, nor should it be. If it were, then simply losing that summary judgment or losing a contested, a hotly contested statute of limitations argument would automatically bring sanctions, and that's not the law here or anywhere. This is more than losing. This is documentation of what your people thought about their case. Well, and I'm glad that you raised that, Your Honor, because in fact the district court ignored a substantial amount of exactly that kind of documentation, and that's the problem here. Under any understanding of either the Uniform Trade Secrets Act or the Patent Act, ignoring all of that evidence was reversible error, and let me just run through that evidence. Why did the magistrate judge impose a bond on your side? The magistrate, well, that's a very good point, because the magistrate judge, and let's talk about timeliness in particular, because this is a very good example of what happened in this case and why the district court judge ultimately just failed to engage with the evidence. The magistrate judge imposed a bond in part, at least with regard to the trade secrets claims, because he, quote, predicted, as the district court said, and as Paul Combe argues, that Gabriel's claims may have been time-barred by events that happened in 1999 or 2000 during very early negotiations. The district court seized on that and said, well, you were warned in September 2010 by the magistrate judge, or I'm sorry, by the prior district judge at the bond hearing. But then the district court found that the claims were time-barred, as we've discussed here today, by events that happened in 2003 and 2004. Therefore, the bond hearing, or the bond ruling's, quote, prediction about timeliness was no such thing. It simply did not put Gabriel on notice of a specific defect in his claims. Now, we don't think it was a defect in his claims for all the reasons argued in the marriage brief, but the point is that with regard to fees, was Gabriel acting in bad faith? No, because Gabriel was not on notice of that defect. And even with regard to the ultimate actual finding of untimeliness, there was substantial contested evidence, at least enough evidence, even if not enough to get past summary judgment, at least enough evidence to give Gabriel a good faith belief that their claims were not time-barred. So you're saying the magistrate judge did not yet have in his possession the Kleiss emails about rip-off and the Shanley emails about we have no case or we engaged with the trial counsel several years ago and still haven't gotten anything? None of those emails were in front of the magistrate judge yet? I believe they were. At least I believe that Mr. Halls was, the magistrate judge at the bond hearing, Judge Anello actually at the bond hearing, used essentially all of the same evidence that the district court used with regard to reaching a conclusion of subjective bad faith. But again, the question is not whether those emails definitively answered the question of subjective bad faith one way or the other. The question is was there contrary evidence in the record that the district court ignored and there was. Not only inside those emails themselves, John Hall's explanation right inside the email saying here's what I'm worried about, he's got those documents, we don't have them, we have nothing with which to essentially support our case at this point because Monk Carter hasn't. The district court also ignored John Hall's declaration explaining exactly that, entirely consistent with the email. And so when it comes to subjective bad faith, the district court ignored that evidence but then also ignored substantial amounts of other evidence showing the very fact that Gabriel posted an $800,000 bond, the largest such bond in California history at the time, was evidence that they believed in their claims. Why would they post that bond otherwise? You'd have to imagine them to be the most reckless of gamblers to do so and that's an unwarranted credibility determination. Is Gabriel bankrupt now? Gabriel has filed for bankruptcy. Okay. Yes, Your Honor. Just curious, hypothetically, if this court affirmed the attorney's fees, would the other side be able to collect that? I don't know. They have filed for bankruptcy, so take that at face value. Doesn't bankruptcy suspend all legal proceedings? A substantial amount of legal proceedings didn't suspend this appeal. You say didn't? Did not suspend this appeal. No, no. Because this is still part of Gabriel's affirmative claims, ultimately, in the scope of this litigation. I would like to return, though, to this idea, though, that there was substantial evidence. So we've got evidence of good faith in the record. We not only have evidence that contradicts the supposed bad faith that's contained inside the original evidence, but we have independent evidence of good faith, the bond. In fact, we've got quite specific evidence of good faith. In December 2009 and January 2010, Mr. Kleiss and Mr. Krausen and Mr. Angus wrote e-mails, and these are the e-mails we're talking about, A6003 and A6010, saying quite explicitly, Qualcomm took this intellectual property. They believed that. They really did believe that that happened. Could they specify exactly how it happened and who did it? At that time, perhaps not, but they believed in it. And this is evidence of subjective good faith. But that relates to the earlier appeal, the statute of limitations. Well, but that's the reason why the district court granted fees here. And so the fact that there was evidence of good faith, it need not be evidence enough to win at summary judgment, but it's enough evidence to avoid this unprecedented sanction. Similarly, on objective baselessness or objective speciousness under the Uniform Trade Secrets Act or the Patent Act, hundreds of pages of expert evidence. Four experts opining that locate originated intellectual property, that the trade secrets were articulated with reasonable particularity, and at least with two of the experts, that it could be traced to Qualcomm's patents. Under the Uniform Trade Secrets Act, under the Advanced Modular Stuttering case, that's strong evidence in favor of the merits of a claim. Under the Patent Act, that's strong evidence. Didn't the experts have trouble locating the inventors, though, amongst the employees of locate? They were not asked to identify specifically locate individuals. During the deposition they were, though. Well, that's right, but that's not what Gabriel asked them to do. And that's the disconnect. Gabriel simply... Well, then it makes it a little bit tougher to make your inventorship claim, doesn't it, if you rely on these experts to say, this consortium somehow came up with certain technology. Right. And yet, you know, we don't put consortiums on the front page of patents, right? We name people. Right. It would make it difficult if that were the only evidence we relied on, or the only evidence we intended to rely on, but it wasn't. The point here was that we had experts who were willing to say, yes, this information came from locate. It made its way into Qualcomm's patents. That's one data point. We also had Mr. Clice and Mr. Carlson and others testify, so recipient witness testimony. Yes, we contributed ideas and inventions to this intellectual property. We also had documentary evidence, such as the Sputnik specification cited in our brief, laying out that intellectual property, and on which the experts relied, at least in part, to form their opinions. You want to save the remainder of the rebuttal time? Yes, Your Honor. Thank you. Mr. Strauss. Thank you, Your Honor. May it please the Court. My name is Steve Strauss, and together with my partner, Tim Teeter, we represent Qualcomm and Dr. Krasner. Your Honor, the purpose of Section 285 of the Patent Act is to compensate a party for attorney's fees that should not have been forced to incur. And Section 3426.4 of the California Uniform Trade Secret Act has a similar purpose. Now, this is a case where the plaintiff, Gabriel, sought a billion dollars, based on allegations that spanned over a decade. Their executives admitted, in some of the emails you referred to, Judge Lurie, that their strategy was to extract a, quote, lay-down settlement from Qualcomm. And that's in the email from Mr. Shanley to Mr. Angus at Appendix 5995. Qualcomm refused to settle, however, because it believed that these claims were meritless. And so over the course of four years, Qualcomm methodically dismantled this case at tremendous effort and expense. Qualcomm won every motion it filed in the case, Your Honors. If we go your way, on the first case, that there was reason to believe that there was trade secret theft, doesn't that work against what you're arguing now on attorneys' fees because they had no case? I think not, Your Honor. In fact, I think it supports it. So again, separating, we have here two different statutes, the California Uniform Trade Secret Act, which you're addressing on the trade secret claims, and then the Patent Act. And I think it's important to note that the district court found, and it's true, that the claims are so intermingled, the patent on patent claims, that the fee award would rest on either. But specifically addressing your question under the Uniform Trade Secret Act, that's exactly what the Alomar case in California spoke to, where it says that if you have a time-barred claim and you pursue it anyway, that is objective speciousness. And that's what happened here, right? Because the first judge, and Judge Chen, you asked about the magistrate judge on the bond order. That was actually the district judge, Judge Anello. And then the case transferred from Judge Anello to Judge Battaglia. So it's important, you have two district judge opinions here, reviewing this evidence and coming out the same. And so the bond order was by Judge Anello, and then again, Judge Battaglia on the later. But they both found that Gabriel had reason to become suspicious, and what's interesting is at that point in time, Judge Lurie, back at the bond order, about halfway through the case, that was before discovery. And so he found they had reason to become suspicious, triggering the statute in California, based on the fact that they were negotiating provisions of the agreement that they didn't like. What happened more than a year later, when that claim came up on summary judgment, partial summary judgment before Judge Battaglia, is that we discovered evidence that showed that Judge Anello was actually right. It had actually progressed from just a reason to suspect to actual suspicion. And those are some of the things that Mr. Teeter spoke about, and were in the merits appeal. Your opposing counsel was saying how Judge Anello's bond was premised on a triggering event in something like 1999 or 2000, not the January 2003 Weiss email, or not the September 2004 Shanley email. Correct, Your Honor. Two points there. First, the bond order appears in the appendix at 2400 at sec, and unlike what counsel said, Judge Anello, in the bond order, addresses the substance of each of the remaining claims in the case at that time, not just the trade secret. On the trade secret, he predicts that he thinks it's good, he predicts, and again this is before discovery, that it's going to be time barred, because in 1999 there were negotiations, there were two agreements here, there was a 1999 agreement and then 2006, and based on negotiations that occurred between the parties, he thought they should have been suspicious. Well, he turned out to be right, but there was even stronger evidence that was induced during the discovery when we got these emails. So when Judge Anello made that prediction that it would be likely time barred, that was before we had discovered the direct rip-off email. That was before new counsel had substituted into the case. So he found that they had reason to be suspicious, but then once we had a record, the District Court Judge Batali was able to find that they actually were suspicious because we know they hired counsel, we know about the direct rip-off email. So those are consistent. I don't think they're different. It's at a later point in time in the case based on discovery. Did I understand you saying earlier that maybe if we were to agree that for one of these situations it's exceptional but maybe not the other? Like, for example, maybe it's conventorship. Yeah, there's a real problem there, but for trade secrets maybe there wasn't a problem there. We would still and we should still affirm the entire $12 million judgment? No, Your Honor. If I said that or you understood that, then I misspoke. What I said is that there's no need to do any apportionment here because the gravamen of the claims on the trademarks are the same as the claims on the patents that Qualcomm misappropriated the trade secrets from Gabriel and put them in their patents. But no, you have two standards, and those two standards are very similar. Under the Patent Act, as you know, under Brooks Furniture, it's a two-prong test where you have to show the objective baselessness and the subjective bad faith. That is the same test as under the California Uniform Trade Secret Act, which requires objective speciousness and subjective bad faith, and there's no disagreement between the parties that those standards are applied the same. You have additional grounds under the Patent Act to affirm because litigation misconduct is a separate independent basis to find exceptionality under Section 285. And, of course, this court found the case exceptional, the district court found the case exceptional under both grounds. They found both that the Brooks Furniture test, the two-prong test, was satisfied, but they also found that there was litigation misconduct. And the litigation misconduct essentially tracked the objective baselessness finding based on the fact that Gabriel never produced any evidence of inventorship such that the case was objectively baseless. But as this court knows from its most recent decision in Kelo Pass, you could even infer subjective bad faith based on objective baselessness facts. You don't need to do that here. You have the so-called smoking gun that Judge Rader talks about in Kelo Pass with all these emails. And we have had two different sets of judges look at these emails and interpret the same way, and plaintiffs may want to quarrel with that, but under the clear error standard, I think there's no way to, particularly when you read them together. And look at the point in time that probably the most revealing emails come out. It's after the point in time that the initial trial counsel has quit, just weeks before the operative fourth amended complaint gets filed, so this is January of 2010, and there's this candid exchange between Gabriel's former officers and directors. And I'll just cite the three emails. I know you've all looked at them, but we have the one from Director Hall to Mr. Shanley where he says we have no case, just a lot of talk. We have, and that's at appendix site 5992, we have another email from Shanley to Angus at appendix 5995 where he says there are those who wonder if there really is a claim against Qualcomm. And then we have the other one that Judge Lurie cited to at appendix 6006 where Mr. Angus says the real value was always going to be in the fight. How to respond to an opposing party's questions. How to make the case. Not that they ever had a case. How to make a case. How to extract a laid-down settlement, and that was the email I started with, from Qualcomm. And so, Your Honor, that meets the test under 285. Irrespective of discussion which is occurring at this time about the standard, this case meets the standard of Brooks Furniture in spades and even has the smoking gun that Judge Rader talked about in Kelo Pass that's so hard to find on subjective badge hate. Most of the time you have to infer it, and clearly you can infer it here under the existing law based on the lack of evidence of inventorship, but you don't have to infer it here. You have these emails which show the subjective badge faith clearly. So under both statutes here, the court should find and should affirm. And the current debate, as I said, that's going on with respect to 285 doesn't have any impact on this case, because the discussion about lowering the standard is not necessary in this case. This case meets the standard, in fact, exceeds the standard and is unique with the smoking gun. One other thing that I think helps here in affirming is that unlike in a typical case where a defendant seeks fees as an accused infringer, here, in this case, there's a presumption of inventorship that was in Qualcomm's favor. A patent is presumed to name the correct inventors. And so Gabriel's burden of proof would have been to show that they actually invented or contributed to the invention of these patents by clear and convincing evidence. And that can only be proven through clear, convincing, and corroborating evidence. And they produced none of that. So when you look at it unlike the typical case, when you look at the bar here that they had to surmount to prove these inventorship claims, not only did they not come near the clear and convincing standard, they had no evidence, as the district court found, no evidence to support the inventorship claims. And that was fundamental. That was the linchpin of the objective baseless determination, which again by itself would be sufficient to infer subjective bad faith, but you don't need to do that here because you have the emails. So with that, I see that I have some time left. I believe I've addressed the panel's questions and I believe I've addressed what counsel covered and I'd be pleased to answer any further questions of the panel at this time. Thank you, Mr. Strauss. No further questions. Thank you, Your Honors, and we request that the sanction award of $12.5 million be affirmed. And just one other thing to your question, Judge Chen. Sorry, I just thought of this, though. I think it's responsive to your question. The district court was thoughtful in determining the amount of the sanction because it dates from the bond hearing forward, not before. And that was clearly at the point in time when these claims should not have been pursued. Thank you. You accumulated $12 million in fees in that period of time? Yes, Your Honor. There was 106 witness interviews and document custodians. There was 12 million records collected. There was 1.2 million pages of documents produced, 40 depositions taken, and 23,000 attorney hours spent because of these claims. Remember, they started out with 16 patents and 92 applications and winnered it down. And so that's why, Your Honor, this is the poster child for an exceptional case award. Can I just add that the amount of the fees is not an issue here? Correct. That was not questioned below. Okay. Mr. Nyer has a little rebuttal time, a minute and a half. Thank you, Your Honor. That is an extraordinary amount of fees to incur defending against Paper Tiger claims. There's a disconnect there. These claims weren't entirely basis. There was substantial evidence in favor of them. That's why it was a hotly contested litigation. I'm glad that counsel brought up Kela Pass. Under Kela Pass, what matters most is the objective merit of claims and whether there was evidence. In this case, it's starkly different than Kela Pass. In Kela Pass, claims were supported by two or three equivocal opinions of attorneys, no real hard evidence. Here we've got expert evidence, recipient witness testimony, documentary evidence supporting claims. Was that enough to prove our claims, as Mr. Strauss keeps saying? That's not the question here on the fee appeal. The question is, was there competent evidence? And there was, enough to give Gabriel a good faith belief in its claims. Also, with regard to the evidence, I think it's important to note, to reinforce this idea that the fee award goes back to the bond ruling. The district court did not grant fees because the claims were untimely. It granted fees because it believed that Gabriel was on notice of that. But for all the reasons I've explained, it wasn't. And, in fact, it wasn't until after the bond ruling that four qualified experts supported these claims and all of this other evidence came on board. This all gave a substantial reason for Gabriel to have a good faith belief in its claims, and the district court committed clear error under any understanding of the Patent Act or the Uniform Trade Secrets Act by ignoring it. Thank you, Mr. Neier. Let's take the case under revising.